Good morning. My name is David Porter, and I represent the Appellant John Leslie Borg. The principal issue in this case is whether Ron McIver, the petitioner's trial counsel, was ineffective for failing to have renewed the change of venue motion at the conclusion of voir dire. Now, the first prong of Strickland requires this Court to ask whether Mr. McIver performed up to the standard of a reasonable attorney. And to do so, the Court must then analyze what is the proper standard for granting a motion to change venue. Justice Tabriner, writing for the Court in the seminal case of Martinez v. Superior Court, said that the motion must be granted if there is a reasonable likelihood that the pretrial publicity will make it unfair, will make the trial unfair. Now, there are three important things that he said regarding the standard. First, that there is no requirement to show actual prejudice. Second, that this is an easier standard of proof to meet than more probable than not. And third, that any doubt must be resolved in favor of the moving party. Now, the California courts repeatedly analyzed the case. But prejudice is an element of Strickland. Yes, it is, Your Honor. It is. And that redoubles back on whether he performed as a reasonable attorney would, as the district court properly recognized. That analysis collapses on the first element, because if a reasonable attorney would have made such a motion and there was a reasonable likelihood that the trial would be unfair, then the result of the proceeding would have been different. Well, don't we have to conclude that if such a motion had been made, it had a chance of success or it would have been successful, otherwise there's no prejudice. You can make a million motions that are unsuccessful, but if you know they're going to be unsuccessful, it doesn't meet the second Strickland prong. So what assurance do you have on this record that a renewed motion would have been granted? The California courts identify five factors that they analyze to determine whether a motion for change of venue should be granted. And again, all of these factors go back into the question of whether there is a reasonable likelihood that the trial would be unfair. First is the nature and gravity of the crime. Second is the prominence of the victim in the community. Third is the standing of the accused in the community. Fourth is the size of the community. And fifth is the nature and extent of the pretrial publicity. There was one motion for change of venue made, correct? There were at least two, yes. And what arguments were available later that weren't available to counsel earlier? What was the changed circumstance that would have put counsel on notice that he should try again? All of the voir dire, Your Honor. After the denial of the two motions for change of venue, there was further time elapsed where there was further publicity. And then there was voir dire. They actually called in two veneers of 150 people each. They had questionnaires, detailed questionnaires that were sent to the jurors, prospective jurors that were filled out. And they had the questioning during voir dire to determine what was the extent of the taint on the jury of the pretrial publicity. So there was a great deal of additional information that was available to Mr. McIvor that would have put him on notice that a new change of venue or renewed change of venue motion should have been interposed. Now, the California courts have disagreed with that, correct? They have held that a change of venue motion was not well taken. That was in the first instance, Your Honor. The court of appeal issued the alternative writ at the direction of the California Supreme Court. And there was a written opinion based on what was happening at the time and what evidence was before it. But the court specifically noted then that should we be proven wrong in our assumptions by the actual voir dire, then counsel, the trial court not only has the opportunity but the duty to grant a change of venue motion. After that, the Petitioner exhausted the change of venue issue in the California Supreme Court with a petition for writ of habeas corpus. And that decision was a summary decision. There was no explanation given by the court, other than the lack of diligence and on the merits, why that petition was denied. Now, all five of those factors I have mentioned weigh heavily, heavily in this case in favor of the defendant. The gravity of the crime, this was a capital murder trial. The crime is of the utmost gravity in the community and, of course, of the utmost consequences to the defendant whose very life was at stake. The nature of the crime, the peculiar facts of this crime made it especially sensational. The alleged brutality, the torture, the binding of the hands, the crushing blow to the head, the blood-soaked bed, all of these factors were highly sensational and highly publicized. Second, the prominence of the victim. Evelyn Minch was an 82-year-old, lifelong Red Bluff citizen. And one of the articles, Community Shocked by Mrs. Minch's Death, a whole article that was devoted to Mrs. Minch and her place in the community, she and her husband opened the first supermarket in Red Bluff. And it really- Don't you have to look at the – now that you've had a jury selected, you don't have hypothetical questions about what all this publicity did to the potential veniring people. You know these people were examined and selected for the jury. So don't you have to look at what jury you got from the process? Yes, Your Honor. And how does the pretrial publicity poison that jury panel if the answers that those jurors gave show that they could fairly sit as jurors? Well, that is – that's the problem, Your Honor. The answers they gave did not show that they could fairly sit as jurors. And as we point out, it's- Then why didn't you use all of your peremptories then? Your Honor, that has some superficial appeal to it, that there were four peremptories left unused. But there are several reasons why that is not dispositive. First of all, as we noted in our – in our reply brief, the effectiveness of voir dire in exposing prejudicial – prejudice in potential jurors is very questionable to begin with. There's an inadequate understanding of the way pretrial publicity influences the thought process of prospective jurors. Well, what does that mean? Every time there's publicity after the trial, they just get rid of it. There it is. The variation of the potential jurors is worthless. Where is that? I'm not suggesting that it's worthless, Your Honor, but there are many reasons why one would challenge a potential juror, and it depends on what jurors were left in the box as to whether you're going to go with the lesser of two evils. I mean, the jurors who were in the box might have been exposed to even more prejudicial pretrial publicity than the ones that are being picked. Furthermore, there are many tactical costs that may lead a counsel to make less than full use of the – of the peremptory chart – peremptories. The voir dire questioning of jurors' fairness in light of publicity may antagonize other jurors by suggesting that they are not open-minded, that they could not take a position against their neighbors, and that their community could not provide a fair trial. Those are great hypothetical theories, but where does that get us in this case? You've got an actual jury selection following challenges in the State courts, and you get a jury, and you've got 12 people and however many alternates. What do these hypothetical questions about the validity of the voir dire have to do with those 14 people? Well, Your Honor, the – first of all, there were 60 – there were 66 people out of the 247 that actually showed up for jury duty on that day who exhibited disqualifying prejudice. And they were disqualified, so they didn't sit on the jury. So that takes you to Judge Nelson's question, which is what evidence as to those people who actually did sit? Well, Your Honor, I think it's important to – to realize that not all of the disqualifying prejudice are going to be disclosed by every juror. That's, I think, a very obvious proposition. When you're sitting there in front of the judge, you're not going to – a lot of people will not display those. And it's very significant that such a high proportion of the panel did exhibit those. But if you look at the – we have extensive analysis of the people who actually sat on the jury, and it's quite amazing. Ms. Tipton read about the case in the newspaper and heard radio and television reports. She remembered that her initial shot to the murder. She knew that another person had been tried. Ms. Eustace actually worked for Minch Meats. Her husband worked for – or her father-in-law worked for Ms. Minch, and her mother-in-law was a friend of the victim. She remembered reading that Ms. Minch's home had been broken into and that she had been murdered while she was in bed reading. She knew that two people had been arrested for the offense. Mr. Rodriguez disclosed during initial questioning that his wife had recently read something in a newspaper regarding the case, and he remembered reports that Mr. Borg was walking in the alley and they had found some kind of evidence in the home. That's very specific information that someone who was actually on the jury remembered. The counsel, you know, so they remember what they said. Somehow, you just deal with it as a judge, but they can lay aside this information and make a decision based simply on the information that's presented in court. Yes, Your Honor, but the – You have a state of corrective challenge, and they say no for cause challenge, and so the judge has accepted them. Yes, Your Honor, but the Supreme Court of the United States said in Erwin and in many – that have been cited that the court cannot just simply take that and that's the end all of the analysis, that a juror's, you know, assurance to the court is sufficient and that will end the analysis. In light of all of these factors and in light of all of the specific detailed information that even the sitting jurors had, a – there is at least, at least a reasonably like – reasonable likelihood that a motion for change of venue would have been granted. On – I'd just like to mention briefly on the issue of the Marsden claim that all that we are seeking is a remand to the district court for an evidentiary hearing. It is obvious to me, at least, that the hearing that the trial judge had on the – on the Marsden hearing, the hearing that the judge had on the Marsden hearing, was a very serious case, and I believe that the court had a proper inquiry into the letter, instead of starting off the hearing saying, oh, he's a fine, fine lawyer and you are not asking for a Marsden hearing. Well, he said he was a fine, fine lawyer. Didn't the defendant say that? And that he was asking for another one. He liked this one so much, but he was busy and he wanted a second one. I read it as asking for more help, not asking for substitution. Well, he did want more help. It wasn't so much that he liked what this attorney was doing. He had 11 complaints about what the attorney was not doing, was not filing motions, was not keeping him informed, was not giving him the transcript of the earlier trial. There were 11 specific complaints. And he was – he was, you know, he said he thought he was a good lawyer, but then when you read the letter as a whole, you have to conclude that this is a very – this contains very serious complaints against the lawyer. And he wanted a second lawyer because the first wasn't doing his job. Counsel, you have less than a minute if you'd like to save some rebuttal time. I will reserve that 45 seconds, Your Honor. Thank you. We'll hear from the State. Thank you. May it please the Court, my name is Eric Brunkle. I represent the – the appellee in this case. Let's look at the jury that was actually picked. Five of the jurors had no recollection of the case or any of the media coverage of it at all. The other seven had – had minimal recollection of the newspaper articles or the television or radio coverage. All of them, all of them said that they could be fair and impartial. Importantly, that's one of the things that would have needed to be proven to get a change of venue, was that the biases from the media coverage could not be laid aside. Counsel, it seems to me that there's – it's a sufficiently tight-knit community. The victim was sufficiently important. And a substantial number of people had feelings about how the case should come out. Is there any chance, in your view, that a renewed motion might have been successful? No. And as far as – You think it's impossible for it to have been successful? No. And as far as whether this is a tightly-knit or loosely-knit community, the California Court of Appeal found that it was not a tightly-knit community. And that finding in their decision is due deference in this case under the AEDPA. It's not up to debate now whether it's a tightly-knit community or loosely-knit community. And what are the other factors that go into that equation as far as the State standards for change of venue other than what may have been altered by voir dire? And voir dire did nothing to change the conclusions of the Court of Appeal. What the Court of Appeal had in front of it at the time was much more information than the ordinary change of venue that gets brought up to them on a writ of mandamus. They had already had the trial of the co-defendant in this case, plus the trial counsel, appellant's trial counsel, in this case hired an expert to go out and survey the community to find out what effect the media coverage had on the potential jury pool. Nothing in voir dire changed the conclusions that the Court of Appeal drew. And from those conclusions, the Court of Appeal said, this is a loosely-knit community because many of the residents do not live in Red Bluff. Many of the residents in Tehama County live out in rural areas. The newspapers have very small circulation. And they did say the status of the victim versus the status of the defendant in this case may have weighed in favor of change of venue, but there were no political overtones in this case. And importantly, the media coverage that was in the papers and in the news, in the TV and radio, had all been basically right around the time of the crime and then again when the co-defendant was tried. But the Court found that it was all fair, it was all balanced, it was honest, it wasn't hostile toward the defendant. In fact, they had comments in there from, I think, prominent persons is what they said, that said the DA is going to have a hard time in this case because there's hardly any evidence against this defendant. So the newspapers and the media weren't out to hang the defendant in this case at all. But what I see this case is about is that the appellant's arguing that his counsel was ineffective for failing to move for a change of venue. But he did move for a change of venue. He moved for a change of venue twice. Both times he took writs of mandamus up to the court of appeal. Both times he lost. Once he petitioned for review to the California Supreme Court, which the review was granted. I mean, the lawyer in this case went to a lot of work on the change of venue. This is not simply a case where, oh, he forgot he could get venue changed or he was too lazy to move for the change of venue. I mean, he went to a lot of effort. And finally it came down to the court of appeal saying, look, based on what we have in front of us, based on what we know from the co-defendant's trial where they easily impaneled an impartial jury, based on what the appellant in this case, the defendant in that case has presented to us in the way of his public survey that surveyed the potential jury pool, there's not enough here. And unless what we find out at voir dire changes that, there's no reason for the trial court to grant any motion for change of venue. So why didn't he make a change of venue motion after voir dire? Well, either he knew he was going to lose for yet a third time, or it was because he believed he could get an impartial jury. And, you know, by the time he had gone to all this effort, he pretty much was familiar, I think, at that point with the standards to get venue changed. So as he was going through voir dire, and he noticed, hey, you know, I think out of 300 jurors that were called, only 53 of them, I think the district court found, 53 jurors that were disqualified for exposure to the media coverage. And even a couple of those, the district court said, well, they might have been excused for a couple of other reasons. I think counsel said that 66 were disqualified for their biases. But I think some of those were just merely because of their views on the death penalty one way or the other, or that they knew the defendant or that they had known the victim. So we're talking about one-sixth of the jury pool that was dismissed. And the expert who had done the original study, what was the expert's view as to the percentage of the community that might have been tainted by the publicity? Was it substantially different than that? I don't believe he made any conclusions about how many were tainted. I think the conclusions he came up with were that 60-some percent of the community was aware of it and had read media reports about it. I think the conclusions that the district court below found that even a greater percentage of that had some recollection of the murder in this case. But the important thing is, what percentage was so biased that they couldn't set that bias aside and be fair and impartial? And in this case, although 53 of them were rejected because of their exposure to the media, half of those, about 24 or 25, were just agreed upon from the community jury questionnaires between the prosecutor and the defense counsel that we don't even want to see these people. And so there never were questions about whether they could be fair and impartial despite their exposure to the media coverage. Now, the other half, maybe 25 or so of those jurors out of 300, were questioned on voir dire and did say that they couldn't be fair for some reason. Very small percentage when compared to some of the cases that the U.S. Supreme Court has said that it was fine that there wasn't a change of venue. Murphy v. Florida, 26 percent of jurors were biased by the media coverage. And in this case, the percentage was far less than that. So the question is, you know, is the State Court's decision denying Petitioner's ineffective assistance claim an unreasonable application of United States Supreme Court precedent? It's not in this case, because the United States Supreme Court has said that it was okay in many cases where the percentage of jurors that were biased by the media coverage was higher than in the instant case. The other thing that the United States Supreme Court or any other thing the United States Supreme Court has said is that not using all of your preemptory challenges is very strong evidence that you're happy with the jury, that the jury that was selected is fair and impartial. And I think that that's what we get down to in this case, is that the reason that there was not another motion for change of venue is because the defense counsel was happy with the jury. In fact, he dismissed some jurors that had no recollection of any of the media coverage with preemptory challenges, indicating that he was more worried about those jurors than he was about other jurors on the jury that had remembered something from the media. And I think maybe his decision or his tactic not to make a motion for change of venue because he was happy with the jury was a good one, because his client was happy with the jury, but his client ended up getting life instead of death in this case. So he must have seen something in that jury that he felt he could work with. And unless there's any more questions. Judge Hall, do you have any more questions? No questions. Thank you, counsel. Mr. Porter, you have a very brief time remaining for rebuttal. Just three brief points, Your Honor. First, there were political overtones to this case. The county had a projected $1 million budget deficit. The trial could, as one of the reporter or one of the newspaper reports said, wipe out the DA's budget, and a change of venue would entail a substantial additional cost. That's at Clerk's discretion. Second, the district court found that it was likely that 96 percent of the jury pool was exposed to pretrial publicity. Your Honors, I would urge you to read pages 34 through 36 of our opening brief. That describes in detail the actual jurors who sat and their exposure to the publicity. And if, after reading that, the Court would be comfortable saying, I would sit as a defendant in front of that jury, that that is a constitutionally constructed jury, then the Court should affirm. If it does not, the Court should reverse. And the alternative, we ask that the Court remand the case for an evidentiary hearing on the Marsden claim. Thank you, counsel. Thank you, Your Honor. I appreciate the arguments of both parties. The case just argued is submitted.
judges: Hall, T.G. Nelson, Graber